Philip Levit, Appellee, v. John C. Bowers, Trading as John C. Bowers Company, Appellant.

Gen. No. 46,161.

Opinion filed May 11, 1954. Released for publication June 3, 1954.

ERNEST A. EKLUND, of Chicago, for appellant; JOHN N. THORNBURN, of Chicago, of counsel.

LEDERER, LIVINGSTON, KAHN & ADSIT, of Chicago, for appellee; BURTON Y. WEITZENFELD, MAURICE B. WOLF, and ROBERT B. SIMON, all of Chicago, of counsel.

MR. PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

Defendant is a realtor who held an exclusive agency for the sale of a large plot of ground at 55th street and Cicero avenue in the City of Chicago. In June 1949 he mailed a letter to about a thousand real estate brokers in the Chicago Loop, offering to pay a full commission to realtors who "successfully negotiate a sale" of all or a portion of the property. Plaintiff is also a realtor who claims that pursuant to defendant's offer, he successfully negotiated a sale of a portion of the property and is entitled to a commission for so doing. A verdict for $4,200 was returned in plaintiff's favor and judgment was rendered thereon by the trial court.

The principal issue turns on the meaning of the words "successfully negotiate a sale." There is some difference, although not much, on the facts of the case. Since the jury found for plaintiff and since that verdict is not against the manifest weight of the evidence, we accept the account of the transaction as given by plaintiff. From this it appears that plaintiff called defendant's place of business about the middle of September 1949 and inquired about the property. He was referred to Maurice F. Brown, a salesman for defendant. Shortly thereafter, in the middle of September, he received the letter of June 27, 1949, and a plat showing the property. The letter was addressed to plaintiff, bore the title: "Re: Industrial Vacant," and started as follows:

"We will pay full commission to realtors who successfully negotiate a sale of any or all of the parcels of industrial land described more fully on the enclosed plat."

Then followed a list of seven parcels with prices set opposite each. The highest price was thirty cents a square foot. On September 30, 1949, Brown called at plaintiff's office. Plaintiff told him he had a client,

345

H. & E. Balaban Corporation, who desired the property for kiddy-park purposes and would pay $56,000 for 280,000 square feet, or 20 cents a foot. H. & E. Balaban Corporation possessed assets of over a million dollars, including a bank balance of $375,000. Brown took the matter up with defendant and the offer was rejected on the ground that the price was too low. However, negotiations were continued. In November 1949, plaintiff submitted an offer of $63,000, or 22-½ cents per square foot; and in February 1950 he submitted by letter an offer of $70,000, or 25 cents a square foot, payable $20,000 in cash and the balance by a purchase money mortgage. These offers were rejected because the price offered was too low. On March 15, 1950 plaintiff received another letter from defendant, similar to that of June 1949, reiterating the offer to pay a full commission for successful negotiations. Conversations followed this letter, and plaintiff submitted an offer of $84,000, $42,000 down and the balance in a purchase money mortgage. This offer met the highest price which had been asked by defendant but it was rejected, defendant insisting on payment in cash. On May 17, 1950 plaintiff submitted an all cash offer of $84,000, or 30 cents a square foot. This offer was agreed to and defendant stated he would give plaintiff the name of the lawyer for the seller so that the attorneys could draft the necessary agreement. On the same day, plaintiff confirmed this conversation by letter. On June 5 he called defendant by telephone, telling him the offer was still open and asking the name of his attorney immediately. Defendant did not give plaintiff the name of his lawyer nor did he take any steps to close the deal, and the negotiations terminated.

It is contended by defendant that the words "successfully negotiate a sale" mean that no commission was to be paid unless the sale was consummated. Plaintiff contends that he successfully negotiated the

sale when, after long and protracted negotiations, he procured a purchaser who was willing to buy on the terms demanded by defendant, that is, 30 cents a square foot, in cash. Like many words which describe human conduct as related to affairs of commerce, the word "negotiate" can be used in many different senses. In Webster's International Dictionary, it is defined as follows:

"To hold intercourse or treat with a view to coming to terms upon some matter, as a purchase or sale, a treaty, etc.; to conduct communications or conferences as a basis of agreement; as to *negotiate* for the purchase of a house."

It may mean an actual "transfer for a valuable consideration." It is also used as a synonym for "surmount or traverse," and in that respect applies to any test of skill or strength. In common parlance among business men today it may mean the performance of the business in hand. The word "sale" means generally the actual transfer from a seller to a purchaser. It is often used, however, to signify the conclusion of negotiations even though final transfer has not been made. It is not uncommon for one business man to say to another after bargaining has led to an agreed price, "You have made a sale," although no actual transfer has as yet resulted. " 'Sale,' as applied to relation between landowner and real estate broker working to secure purchaser of land, means procuring purchaser able, ready and willing to buy on terms fixed by seller." Black's Law Dictionary, 4th Ed., p. 1504. The question then is—what did the parties to this transaction reasonably understand by the words used?

██ The letter in question was prepared and signed by a realtor and sent to a thousand real estate brokers—men who make their living as agents for buyers and sellers of real estate. The final transfer

was beyond their control. Hence it has been held by courts that barring the express statement of a condition to the contrary, a realtor has earned his commission when he has produced a buyer ready, willing and able to buy. In *Glatt v. Adams,* 226 Ill. App. 321, the broker produced a buyer who was ready, willing and able to buy, but no contract of sale was executed because the defendant later stated that he was not satisfied with the financial responsibility of the proposed buyer. Notwithstanding that, the court held that the broker had performed his part of the transaction when he submitted a buyer whom the seller accepted without challenging his financial responsibility. But it is contended by defendant that this general principle as related to the duty of a broker was enlarged in the instant case by the terms of the letter in question to require that a sale be consummated before the broker was entitled to his commission. If this is so, then the solicitation by the defendant of the services of a thousand realtors in the Chicago Loop was hardly more than a snare and a delusion. In our opinion, the words in question merely emphasize the requirement that the agent would by negotiation produce an offer that met the terms and conditions laid down by the seller. The facts of the case illuminate their meaning. Nothing is said in the letter of March 15, 1950 with respect to payment for the land, and the seller had the right to and did insist on full payment in cash. Balaban finally agreed to this condition. The property being vacant and the transaction being for cash, there was left no matter of substance to be decided. At that point the negotiations had ended successfully. All that was left was the submission of a title opinion and the adjustment of one or two details such as the apportionment of taxes.

██ The interpretation of phrases such as those involved in the instant case depends largely upon the

348

circumstances of each case. Precedents interpreting the particular words are scanty but in our opinion support the conclusion we have reached. "Negotiating a deal" does not require consummation of the deal. *Donahue v. Fuller* (Tex. Civ. App., 1928), 5 S.W.2d 1037. The word "successfully" was not used in that case but as we interpret it, the word "successfully" as used in connection with "negotiate" in the instant case meant negotiations which would end in an offer that met all the terms imposed by the seller. In *Intermountain Title Guaranty Co. v. Egbert*, 52 Idaho 402, 16 P.2d 390, the question involved was whether or not certain acts of the defendants were within the meaning of the Blue Sky law which provided that they should not "sell or negotiate for the sale of any stocks, bonds or other securities." The court said:

"The act itself recognizes the difference between completed and incomplete transactions by saying, 'which shall sell,' meaning the completed sale, which of necessity includes everything going before, and 'negotiate for sale,' which evidently signifies the steps leading up to a sale. The conclusion is inescapable that there was a 'negotiation for sale' in connection with the transaction in question. *Rhines v. Skinner Packing Co.*, 108 Neb. 105, 187 N. W. 874; *Groby v. State*, 109 Ohio St. 543, 143 N. E. 126, 128; *Cameron v. Ayres*, 175 Cal. 662, 166 P. 801; *Everson v. Gen. Acc. Fire & Life Assur. Corp.*, 202 Mass. 169, 88 N. E. 658; *Northrup v. Diggs*, 128 Mo. App. 217, 106 S. W. 1123; 45 C. J. pp. 1374-1376."

The cases cited by defendants are cases in which the commission was contingent on final execution of the deed or some other act and point up the fact that if the defendant in the instant case had sought to make consummation of the transaction a condition of compensation for the broker, he could easily have found words to do so. Thus, in *Stein v. Emerman*, 203 Ill.

App. 316, the broker was not to be paid until a loan to be made in connection with the purchase was made and accepted and the "moneys are paid over on the second mortgage." The court held the agent to this agreement. In *Husak v. Maywald,* 185 Ill. App. 479, the language specifically provided that the commission was to be paid "when deal is consummated." The deal was not consummated because there were defects in the title to property of the plaintiff's prospect which was to be used in exchange for the defendant's property and this, in effect, meant that the broker had not produced a buyer ready, willing and able to buy. We hold that the plaintiff in the instant case had successfully negotiated a sale when he finally produced a buyer who met all the terms the defendant had specified.

 Defendant next contends that to constitute a successful negotiation, buyer and seller must be bound by a valid contract. None of the cases cited support the position taken by defendant. The sale of vacant property for cash is a simple transaction and if the seller had desired to have a contract reduced to writing, he could have done so in short order when plaintiff informed him that the buyer was ready to make the deal on the seller's terms. The fact is that after receiving the offer on his terms and stating that he would make arrangements to have lawyers draft the contract, defendant did nothing and thus prevented conclusion of the deal. It appears to us from the evidence, as it did to the jury and the trial court, that the transaction failed solely because the seller arbitrarily refused to go through with the deal. That was his right as against the prospective purchaser, but he was not thereby relieved of the obligation to pay a commission to plaintiff. True, defendant testified that he advised plaintiff orally that one of the conditions for the payment of a commission was that a written offer binding the buyer should be submitted. This the plaintiff de-

nied, and the verdict of the jury is conclusive on that point. In *H. J. Coleman & Co., Inc. v. Campbell*, 339 Ill. App. 646 (1950) the court, speaking through MR. JUSTICE SCANLAN, after stating it would assume for the purposes of the appeal that the contract contemplated consummation of the sale before the commission was earned, found for the broker, and quoted with approval the following language from *Goldstein v. Rosenberg*, 331 Ill. App. 374–5:

"Defendant's position is that the consummation of the deal was a condition precedent to his obligation to pay a commission, even though the failure to consummate the deal was due to his fault. This position is untenable. Defendant cites a number of cases, in most of which the purchaser defaulted in the performance of his contract. The better rule, consistent with honesty and fair dealing, is that the seller cannot take advantage of a condition precedent the performance of which he has rendered impossible. *Stern v. Gepo Realty Corp.*, 289 N. Y. 274; 12 Am. Jur., Contracts, Sec. 329; Restatement of the Law, Contracts, Sec. 295; Williston on Contracts, Rev. Ed., Vol. 3, sec. 677."

Defendant contends that Harry Balaban, the president of H. & E. Balaban Corporation who had authorized plaintiff to make the offer, had not been specifically authorized by a resolution of the board to act on behalf of the corporation. Balaban took the stand and corroborated the agent's testimony as to the offer. The corporation was in the amusement business, it had a large amount of cash on hand, and the acquisition of land for a kiddy park does not appear foreign to its purposes. No formal resolution showing the authority of the president of the corporation was requested by the defendant. Such a request might have been reasonable had the defendant asked for it in the first instance, but defendant made any action in this

351

respect unnecessary by his refusal to go further with the transaction after the offer meeting all his terms was made. We could let the matter rest on this ground, but there is also the principle that the president of a corporation is presumed to have authority in the absence of any evidence to the contrary. *Domestic Building Ass'n v. Guadiano*, 195 Ill. 222; *Village of Prairie du Rocher v. Schoening-Koenigsmark Milling Co.*, 248 Ill. 57; *Nagle v. J. L. Hanson Co.*, 262 Ill. App. 160; *Jones & Dommersnas Co. v. Crary*, 234 Ill. 26.

*Judgment affirmed.*

ROBSON, J., concurs.
TUOHY, J., took no part.