[Civ. No. 26443. Second Dist., Div. Four. May 1, 1963.]

RIVADELL, INC., Plaintiff and Respondent, v. GEORGE RAZO, Defendant and Appellant.

Smithers, Potter, Good, Wildman & Gregory and Paul W. Wildman for Defendant and Appellant.

William Levin for Plaintiff and Respondent.

BURKE, P. J.—Defendant owned two lots, located on Ventura Boulevard, in Sherman Oaks, California. One lot was fully improved with an eight-unit motel. The other lot was largely vacant, although a four-unit apartment was located on the rear portion of the lot. The parties referred in testimony to this second lot as the "vacant" lot and we adopt their terminology.

On February 9, 1960, in response to a newspaper advertisement, defendant's wife phoned plaintiff and its president and a salesman called on defendant. After a conversation, and under circumstances hereinafter described in detail, defendant signed an exclusive six-day real estate listing for the sale of his two lots.

Plaintiff presented to defendant, within the six-day period, two offers to purchase the lots in question. Both were rejected and defendant broke off relations with plaintiff. Alleging that, within the time limit set by the listing, it had procured a ready, able and willing purchaser, plaintiff brought suit for breach of contract, claiming to be entitled to its commission. Defendant filed a general denial. The case was tried without a jury, resulting in findings and judgment in favor of plaintiff. This appeal followed.

The listing, so far as is pertinent to this appeal, read as follows:

"In consideration of the services of LYNDELL COMPANY, herein called Broker, I hereby employ Broker, exclusively and irrevocably, for the period beginning FEBRUARY 9, 1960 and ending at midnight FEBRUARY 14, 1960, to sell the property situated in —— County of ——, California, described as follows:

THE DELL MOTEL
14936 — VENTURA BLVD.
SHERMAN OAKS
LOT 43 & 44

and I hereby grant Broker the exclusive and irrevocable right to sell said property within said time for ONE HUNDRED TEN THOUSAND DOLLARS ($110,000) Dollars and to accept a deposit thereon of $5000.00

Terms: BUYER to make down payment of $20,000. BUYER TO EXECUTE A 1ST DEED OF TRUST IN FAVOR OF SELLERS FOR BALANCE OF PURCHASE PRICE IN FAVOR OF SELLERS PAYABLE $650 MONTH INCLUDING 6% INTEREST PER ANNUM UNTIL PAID. SELLER WILL SUBORDINATE SAID LOAN TO NEW BUILDING LOAN NOT TO EXCEED $450,000 AT AN INTEREST RATE NOT MORE THAN 10% FOR A TERM OF 18 YEARS, PROVIDING BUYERS PAY OFF $20,000 ON BALANCE.

I hereby agree to pay Broker as commission FIVE (5) per cent of the selling price if said property is sold during the term hereof or any extension thereof by Broker or by me or by another broker or through any other source. If said property is withdrawn from sale, transferred, or leased during the term hereof or any extension thereof, I agree to pay Broker said per cent of the above listed price.''

The evidence indicates that defendant did not read the document in its entirety before signing. To assist defendant, purportedly, plaintiff's salesman read it aloud. It consisted of a printed form with the blanks filled in by plaintiff's salesman. (The handwritten portion is shown in capitals.) When plaintiff's representative asked if defendant would agree to subordinate his purchase money trust deed to a construction loan on the property, defendant indicated that he would be willing to do so only as to the vacant lot and not as to the fully improved lot and further that before he would agree to such subordination he would require an additional $20,000 to be paid down. The salesman thereupon added the subordination clause to the listing. Defendant did not note that no mention was made in the writing that any new construction loan was intended by seller to apply only to the vacant lot.

In its findings (prepared by plaintiff) the court found that on February 11, 1960, plaintiff presented defendant with a written offer to purchase the property by Firestone Construction and Investment Corporation, which offer was accom-

panied by a check of $2,500 as a deposit on account of the purchase; that this offer was unacceptable to defendant and defendant forthwith rejected it. The findings state: "This offer varied from the terms and conditions of the listing agreement of February 9, 1960."

The court further found that, on February 12, 1960, plaintiff presented defendant with a second written offer to purchase the property couched in words "exactly as listed, except the purchaser reserved the right to designate a nominee, from the Firestone Construction and Development Company, a California corporation, together with a check in the amount of $5,000.00 as a deposit on account of said purchase"; that defendant refused to accept the offer tendered and informed plaintiff "that he no longer desired to sell the subject property to anyone and ordered plaintiff off of his property. That plaintiff informed defendant . . . that he would be liable to plaintiff for a full commission of [*sic*] the selling price and demanded the sum of $5,500.00 from defendant. . . . Defendant . . . refused to have any further discussions with plaintiff concerning the sale of his property."

The court further found that defendant raised no objection to the terms of the proposed offer of February 12, or to the nominee clause or to the ability of the purchaser to complete the purchase and that by his failure and refusal to accept or complete the offer of February 12 he breached his written contract of February 9 and became obligated to defendant for damages in the amount of 5 per cent commission; that by canceling the listing agreement and withdrawing the property defendant obligated himself to plaintiff for payment of the full commission.

On February 11, 1960, plaintiff's representative returned to defendant with the first offer mentioned in the findings. The proposal was for a sale price of $125,000 ($15,000 more than the purchase price called for in the listing). It contained the statement:

"Seller to subordinate to a 1st T.D. on existing property of units — known as parcel I and Seller to subordinate to a construction loan on vacant property known as parcel II.

"Seller to receive 1% per mo. or more at 6% per annum until paid on parcels I and II.

"This offer subject to buyers executing a new loan of approx. 70% on existing units known as parcel I."

The form of this offer is highly significant, since it verifies

defendant's contention that, in his dealings with plaintiff's representatives, he considered his two lots separately and had indicated his willingness to subordinate only the vacant lot, and not both lots, to a new construction loan.

This offer of February 11, 1960, failed to comport with the terms of the listing in several particulars in addition to its crucial variance with the intention of the seller concerning subordination. It increased the purchase price, called for separate subordinations to loans on each lot, omitted any reference to the $20,000 additional payment required before any subordination would be acceptable and altered the provisions for monthly payments. Defendant promptly rejected the offer and we conclude it became apparent that the listing prepared for defendant by his agent, plaintiff, did not reflect defendant's understanding of the proposed terms of sale. Feeling, no doubt, that their sale was eluding them, plaintiff's representatives returned with the second offer worded in the language of the listing. Since such an offer likewise failed to comport with defendant's verbal instructions to his agents as to the terms on which he was willing to sell his property defendant rejected it. In fact, feeling himself to have been trapped into signing an instrument which did not comport with his verbal agreement, he refused to discuss the matter further with his agents and ordered them off his property. No offer was made by his agents to correct the listing. They had his signature. They felt they could sue him for the commission and did. ■ However, the law does not permit its processes to be used as instruments of fraud or sharp dealing, particularly when the one seeking to enforce an unfair advantage is the agent of the other and occupies a position of trust and responsibility toward the other. More particularly is this true where a wide disparity exists, as becomes very obvious from the transcript, between the training, knowledge, education and experience of the agent as compared with that of his principal. ■ These considerations impel the reviewing court to examine the entire proceeding with the critical eye which overreaching and sharp practice always evoke.

Plaintiff's complaint was based upon defendant's failure to accept the offer of a buyer procured by plaintiff who was ready, able and willing to buy the property. There are no allegations of any purported breach by defendant for withdrawal of the property from sale before expiration of the listing. Neither was any such issue injected in the case at

pretrial nor were the pleadings or pretrial order amended at trial to create such issue.

In the joint pretrial statement of the parties, included by reference as a part of the court's pretrial order, appears the following:

## *"Contentions of the Parties*

"(a) Plaintiff contends that Defendant breached the contract for payment of commission by refusing to sell his property to the purchaser obtained by Plaintiff upon the terms and conditions of the exclusive right to sell listing agreement, and the Plaintiff is therefore entitled to damages in the amount of the Plaintiff's commission claim.

"(b) Defendant denies each and every contention of Plaintiff and that Plaintiff has been damaged at all.

## *"Issues To Be Determined by the Court*

"1. Are the Plaintiffs entitled to damages from the Defendant.

"2. Did the Defendant breach his contract with the Plaintiff."

It was the purported wrongful withdrawal of his property from sale by defendant which the trial judge indicated, in announcing his judgment, compelled a decision in plaintiff's favor, overlooking the fact that this was not an issue before the court. The findings, prepared by plaintiff, went beyond the oral statement of the court and found that plaintiff had produced an able buyer and gave judgment upon that ground, as well as upon the ground of withdrawal of the property from sale. However, we may disregard the latter issue as it is fundamental that the judgment must be based on the pleadings and pretrial order, or amendments thereto adopted at the time of trial. (*Crescent Lumber Co.* v. *Larson*, 166 Cal. 168, 171 [135 P. 502]; *Iusi* v. *City Title Ins. Co.*, 213 Cal.App.2d 582, 586 [28 Cal.Rptr. 893]; *Palpar, Inc.* v. *Thayer*, 82 Cal.App.2d 578, 583 [186 P.2d 748].)

Further, proof of prevention or excuse of performance will not support recovery on an allegation of performance. (*Kirk* v. *Culley*, 202 Cal. 501, 506 [261 P. 994]; *Barnhart* v. *Blackburn*, 137 Cal.App. 240, 242 [30 P.2d 424].) Here plaintiff's complaint alleges performance, and judgment was rendered on excuse and prevention of performance by withdrawal from sale. Although defendant could have sought a rescission of the listing agreement or a reformation of it to conform to his instructions to his agents, he did not do so

but rested his case upon the ground that plaintiff did not perform. Even on this ground we feel he is entitled to prevail.

 Defendant contends that a vendor is not bound to accept an offer varying from the terms of the listing. (*Edwards* v. *Billow,* 31 Cal.2d 350 [188 P.2d 748].) Such contention is correct, and in the instant case we hold that defendant was justified in refusing both of the purported offers of plaintiff's alleged buyer. No other offers were submitted, therefore defendant owes nothing to his agents and the judgment was in error.

█ The evidence shows that defendant did strenuously object to the offers tendered by plaintiff, and although the principal reason given for his objection was that he told the broker that he was willing to subordinate his interests with respect to the "vacant" lot only, it cannot be concluded that he waived any other right to object to the offers tendered by plaintiff to the extent to which they were otherwise irregular. The findings that defendant did not object to shortcomings in the offer such as to the ability of the buyer to perform are not supported in the record. In fact the contrary is true. Therefore, the findings that not having objected he waived his right to object are in error.

█ The "listing" agreement was ambiguous and uncertain in several respects. The property description therein was as follows:

"The Dell Motel
14936 Ventura Blvd.
Sherman Oaks
Lot 43 & 44"

This description is incorrect and the error appears on the face of the record. Defendant's property consisted of two contiguous lots, lots 403 and 404 of tract 5822, fronting on Ventura Boulevard, one of which was fully improved with eight motel units; the other, mostly vacant, was improved with a four-unit apartment at the rear of the lot. Further, it is not clear from the listing whether the "Dell Motel" was on one lot or on both lots. Accordingly, parol evidence was admissible to explain such ambiguities.

█ It is not clear from the recital of terms in the listing and the incorrect description whether any intended construction loan to which the rights of defendant would be subordinated was to have been secured by a first lien on the motel lot, the vacant lot or both lots. Such ambiguities

further justify the introduction of parol evidence to explain the true intent and contract of the parties.

Upon a review of the evidence, particularly the deposit receipt, dated February 11, 1960, this court is impressed with the obvious inequity and unfairness embodied in the terms of the offers. It is apparent therefrom that the purported purchaser, except for a token deposit, 18 per cent of the purchase price, sought to use defendant's property as a means of borrowing money to finance a construction project subjecting defendant to the substantial risk involved.

The self-serving testimony of plaintiff's president-broker, was in part that, "Well, he wanted to know about the subordination on it, and he didn't like it, it was just for one parcel, and he wanted it on the entire parcel or the entire property, and so he refused the offer. He said that he wouldn't just subordinate one parcel of the property." Such a desire would be so unreasonable and foolhardy, for any owner, as to be incredible and certainly cannot be categorized as substantial evidence to support a finding by the trial court. In contrast is the testimony of defendant that he did not wish to run the risk of losing all his property by subordination, but would risk losing the vacant lot provided he were to receive $40,000 down on both lots.

As further proof of the obvious design of the intended purchaser to employ defendant's assets as security for its speculative construction purposes, at defendant's risk, defendant was further asked, in the first offer, to subordinate his interest in the "motel" property to a loan to be made by purchaser thereon of approximately 70 per cent of its value. Because of such arrangements the intended purchaser would have been able to secure the very money needed for the downpayment on both lots. His offered increase of the purchase price to $125,000 would enable him to represent the property as of greater value thus supporting a larger construction loan on the vacant lot at the generous, if not unconscionable and confiscatory, interest rate of 10 per cent permitted by the listing. Truly such a proposal assumes either ignorance or trusting credulity in the seller. Defendant's understandable and uncontradicted objections to such proposals are replete in the record of his testimony and there can be little wonder at his being upset at the so-called offers; they bore little resemblance to his understanding of the listing.

Failing to succeed with its first offer, the intended purchaser, through plaintiff, apparently observing that the listing as prepared by plaintiff was not in accord with defendant's understanding or intentions, presented a second offer, on February 12, 1960, expressed in the same terms set forth in the original written listing, such offer being presented by the same intended purchaser, "or nominee." By this time defendant had discussed with an officer of a bank the matter of his having executed the original listing and was more determined than ever to avoid subordination of all his interests in the property. It being then crystal clear that the intended purchaser desired to subject defendant's entire property to its own financing purposes and to defendant's almost certain loss, defendant rejected the second offer on the ground that he did not wish to lose all his property. We hold such rejection was likewise proper under the circumstances and that it did not constitute a withdrawal of his property from sale.

Essentially, from the record, the intended listing contract between plaintiff and defendant offered defendant's property for sale at a price of $110,000, requiring a downpayment of $20,000 and a note and trust deed in favor of defendant for $90,000. As an alternative, at plaintiff's behest, the provision was added that, for an increased downpayment to $40,000, defendant would agree to subordinate his interest in the vacant lot to a construction loan thereon. While such an agreement was not set forth verbatim by defendant's agent, the plaintiff, in the written listing, all the documents and exhibits, read together, with the testimony offered, clearly show such to have been the intended agreement of defendant.

Listing agreements prepared by a broker, being preliminary and unilateral, are not to be construed strictly against the vendor, as between the vendor and broker. In such agreements "[M]uch greater liberality is allowed in construing and curing defective descriptions therein than in cases of executory contracts to convey land or in deeds of grant, for, as stated, so far as the statute of frauds is concerned, the terms of the employment are the essential parts." (*Pray* v. *Anthony,* 96 Cal.App. 772, 777 [274 P. 1024].) In cases of fraud, mistake, uncertainty, ambiguity and unintelligibility, they may be explained by parol evidence. (*Hageman* v. *Colombet,* 52 Cal.App. 350 [198 P. 842].) In the instant case defendant's explanation is a reasonable explanation of the present transaction while plain-

tiff's explanation is not only unreasonable but so slanted as to be unworthy of belief.

Further militating against plaintiff's claim for an allegedly earned commission is the failure of plaintiff to produce a buyer "able, willing and ready" to purchase. No proof was adduced to establish plaintiff's customer as an able, willing and ready purchaser. Who was the purchaser? The deposit receipt indicates it was "Chas. Firestone Construction *Co. and* Investment *Corp. or* nominee." (Italics added.) Such designation, "Chas. Firestone Construction *Co. and* Investment *Corp.,*" is ambiguous; are there two entities or one? True, the ambiguity is cleared somewhat by the execution of the document by "Chas. J. Firestone Construction and Investment Corp. by Chas. J. Firestone (Pres.)." However, the words "or nominee" completely destroy the instrument as a firm and binding offer on the part of Firestone Corp. to buy the property. What it says is, in effect, that Firestone or someone else designated by Firestone will buy the property.

Defendant was agreeing to sell his property for only 18 per cent down with the balance on a long term contract. He was entitled to know with certainty just who was making the offer. Here, it was Firestone Corp. *or* nominee. Assuming defendant accepted the offer and that Firestone changed its mind, the latter could designate *anyone* as its nominee. The seller would then have to look to the nominee. The "nominee" would be an escape hatch for Firestone. Thus, it is apparent there was no binding, unqualified offer on the part of Firestone. On a sale for cash, where the credit of the buyer is not so important a factor an "or nominee" offer could possibly be construed as an obligation on the part of the named purchaser to either buy or see to it that the property is purchased. But, here all the named buyer need do is to designate a substitute and walk away from the transaction. This is not the same as an undertaking on the part of Firestone to buy the property but with a provision in the offer that the purchaser reserves the right to take title either in its own name or in the name of its nominee. In the latter event the seller still looks to the credit of Firestone in evaluating the offer. Here the offer is by a named purchaser, whose credit standing could be ascertained but who can be substituted out the next day for someone whose credit may be nil. Such an arrangement is indefinite, uncertain, unilateral and a nullity.

The "ability to pay" on the part of the intended

purchaser must first be established before plaintiff can claim an earned commission. (*Abbott* v. *Floyd,* 136 Cal.App. 365 [28 P.2d 929]; *McCarthy* v. *Grider,* 72 Cal.App. 393 [237 P. 751].) ▆▆▆ This plaintiff has failed to do. Even if we were to construe the offer as binding on Firestone there was no showing that Firestone had the ability to perform. The agents for plaintiff secured the $5,000 deposit check from the purported purchaser, made payable to the "Occidental Escrow Co." (The deposit receipt requires that the escrow be opened at the "Valleyridge Escrow, Inc."). The check was never deposited with either escrow company, nor cashed. It was introduced into evidence with the endorsement on the back thereof: "to be deposited for purchase of prop. at 14936 Ventura Blvd."

Plaintiff's salesman, Robert Nadell, testified that he telephoned and spoke to a bank officer whom he did not know at the bank on which the check was drawn and asked if the $5,000 check was good; that he was informed that it was. From such testimony alone, which is purely hearsay, we are asked to predicate by inference sufficient financial stability in the unknown purchaser to classify it as "able," willing and ready to purchase property worth $110,000.

There is not a word in the record either from the intended purchaser or from the plaintiff's agents, of their own knowledge, regarding the financial stability of the intended purchaser and the trial court was lacking totally in evidence upon which even a prima facie presumption of ability to perform could be predicated.

The judgment is reversed.

Jefferson, J., and Kingsley, J., concurred.